# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| KEVIN L. JACKSON, | ) | |
|  | ) | |
| Plaintiff, | ) | |
|  | ) | |
| v. | ) | |
|  | ) | Civil Action No.: 03-1596 (RBW) |
| ALBERTO GONZALES,[1] | ) | |
| Attorney General of the United States, | ) | |
|  | ) | |
|  | ) | |
| Defendant. | ) | |
|  | ) | |

## MEMORANDUM OPINION

     The plaintiff, Kevin Jackson, brought this action alleging violations of Title VII of the

Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (2000).  Specifically, the plaintiff claims that

his non-selection for a promotion was the result of both racial discrimination and retaliation in

violation of Title VII.  Complaint ("Compl.") ¶¶ 3, 43.  Currently before the Court is the

Defendant's Motion for Summary Judgement ("Def.'s Mot.").[2]  For the reasons set forth below,

the Court grants the defendant's motion.

---

[1]  Pursuant to Federal Rule of Civil Procedure 25(d)(1), the Court has substituted the current Attorney General, Alberto Gonzales, for Attorney General John Ashcroft who was in office when this action was filed.

[2]  The following papers have been submitted to the Court in connection with this motion: (1) the Memorandum of Points and Authorities in Support of Defendant's Motion for Summary Judgment ("Def.'s Mem.") with the Defendant's Statement of Material Facts Not in Dispute ("Def.'s Stmt."); (2) the Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Opp'n") with the Plaintiff's Statement of Material Facts in Dispute ("Pl.'s Stmt."); and (3) the Defendant's Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Def.'s Reply") with the Defendant's Response to Plaintiff's Statement of Genuine Issues in Dispute ("Def.'s Reply Stmt.")

# I.   Background

## A.   Factual Background

The plaintiff's Title VII claims are predicated on his non-selection for a GS-14 position in August 2001.  Compl. ¶¶ 3, 12.  To provide the necessary background information, the Court will first briefly review the professional backgrounds of both the plaintiff and Jennifer Batchelder, the individual ultimately selected for the position at issue.  Def.'s Mot., Exhibit ("Ex.") 10 at 1. After this discussion, the Court will provide an overview of the process that ultimately led to the 2001 selection of Batchelder that is being challenged by the plaintiff.  The following facts are undisputed or, because the plaintiff is the party opposing summary judgment, construed in the light most favorable to him.  Stewart v. Ashcroft, 352 F.3d 422, 425 (D.C. Cir. 2003).

### 1.   The Plaintiff's Professional Background

The plaintiff, an African American male, worked for approximately fourteen years for the United States Department of Justice, Federal Bureau of Prisons ("BOP").  Compl. ¶¶ 4, 6.  The plaintiff commenced his employment with the BOP in 1987 as a research data clerk contractor.  Def.'s Mot., Ex.1 at 13.[3]  In 1988, after four or five months at the BOP, the plaintiff resigned to work at a research company.  Id. at 14.  However, later that same year, the plaintiff returned to the BOP as a grade level GS-6 research data clerk.  Id., Ex. 2 at 4.[4]  The plaintiff's duties at the

---

[3]  Because the defendant's exhibits include Kevin Jackson's sixty-four page deposition in its entirety, rather than the eight pages that the plaintiff attached to his opposition as exhibit 14, the Court will rely on the defendant's copy of the deposition throughout this opinion.

[4]  In his deposition, the plaintiff recalled that his grade level as a research data clerk was a GS-5.  Def.'s Mot., Ex. 1 at 15.  However, his application for employment to the GS-14 position states that the research clerk position was a GS-6 position.  Id., Ex. 2 at 4.  To the extent that the plaintiff's testimony and application conflict, the difference may be the result of the plaintiff having been promoted to a higher grade while occupying the position. The promotion is not reflected on his application for employment to the GS-14 position.

research company and in both BOP research positions involved similar types of administrative

and clerical duties.  Id., Ex. 1 at 14-15.  In December 1990, the plaintiff was promoted by the

BOP to a grade level GS-7 position as a social science research technician and in this position he

primarily gathered computer data and performed initial analysis for research analysts.  Id. at 15;

Pl.'s Opp'n, Ex. 8 at 4.[5]  In 1992, the plaintiff became a computer specialist.  Def.'s Mot., Ex. 2

at 3.  He held this position until 1995, and while in that job was eventually promoted to the GS-

12 grade level.  Id.  As a computer specialist, the plaintiff worked with both the Key Indicators

Strategic Support System ("Key Indicators System"),[6] and the Executive Staff Management

Indicators System ("ESMI System").[7]  Id.  However, the plaintiff's main responsibilities were

"basic descriptive statistical work" and "software programming" in the Key Indicators System.

Def.'s Mot., Ex. 1 at 16-18.  The plaintiff explained that both the ESMI and the Key Indicators

Systems are independent systems, and that use of the ESMI System by executive staff is

mandatory, while use of the Key Indicators System by BOP personnel is optional.  Def.'s Mot.,

Ex. 1 at 20-22.  During his tenure as a computer specialist at the BOP, the plaintiff obtained his

undergraduate and master's degrees from the University of the District of Columbia, earning an

undergraduate degree in urban studies in 1992 and a graduate degree in urban policy in 1994.  Id.

---

[5]  In his deposition, the plaintiff did not recall the year when he was hired as a social science research technician and stated that he believed his grade level was as a GS-6.  Def.'s Mot., Ex. 1 at 15.  However, the plaintiff's application for employment states that his promotion date was 1990, and that the promotion was to a GS-7 position.  Id., Ex. 2 at 4.

[6]  The Key Indicators System is an "information system that houses data [for] retrieval," Def.'s Mot., Ex. 1 at 17, which "allows [BOP] managers and staff to access data in aggregate form, look at the operations of various institutions, and undertake comparisons."  Def.'s Mem. at 4 (citing Def.'s Mot., Ex. 7 at 28-29).  The Key Indicators System has the capacity to respond to questions and can make contemporaneous statistical and graphical analyses based on data collected from surveys, different computer systems, and other sources.  Def.'s Mot., Ex. 7 at 30-31.

[7]  The ESMI System is a tool used by the BOP executive staff "to monitor and assess the operations of all federal prisons in the country."  Def.'s Mot., Ex. 1 at 18-19.

at 12.

In 1995, the plaintiff was promoted to a social science research analyst position, and in 1998 he was promoted to the GS-13 grade level. Id., Ex. 2 at 2. In this position, the plaintiff oversaw the operation of the ESMI System, which "basically" required him to "assign[] the ESMI work that [research analysts] needed to do[,] . . . set deadlines for that work[,] . . . [and] review[] and provide[] them feedback" on their work. Id., Ex. 1 at 19. Although he assigned work to the three research analysts who worked on the ESMI System, the plaintiff was formally the supervisor of only one of them. Id. at 19-20. While in the social science research analyst position the plaintiff also worked on the Key Indicators System, which required him to "collect and analyze sensitive staff internal affairs data monthly" and "conduct social research" that responded "to either [BOP's] operational needs or an original research problem of [the plaintiff's] interest." Id., Ex. 2 at 2. In 1997 the plaintiff published his first journal article in the Journal of Black Studies. Id. at 7.

In 1998, the plaintiff applied for a promotion to the GS-13 level position of social science research analyst. Def.'s Mot., Ex. 1 at 45. However, he was not selected for the position. Id. Rather, Jennifer Batchelder, who was also a social science research analyst at the BOP, was selected for the position. Id.; Def.'s Reply, Ex. 15 at 4. After his non-selection the plaintiff purportedly complained to his supervisor, William Saylor, who was the Deputy Chief of the Office of Research and Evaluation.[8] Def.'s Mot, Ex. 1 at 46-47; see also id., Ex. 5 at 1.

---

[8] William Saylor was the plaintiff's direct supervisor in late 1995. Def.'s Mot., Ex. 1 at 20. Chris Ennis, Chief of the Statistical Reporting Section at the BOP, became the plaintiff's supervisor in 1999. Id. at 43; Pl.'s Opp'n, Ex. 11 at 1. Ennis left the BOP in 2001 and then Saylor became the plaintiff's direct supervisor again. Id.; Def.'s Mot., Ex. 1 at 20.

However, the plaintiff did not file a formal complaint to express his concerns.  Def.'s Mot., Ex. 1 at 46.  The plaintiff allegedly told Saylor that he believed Batchelder was less qualified for the position because, among other things, she reported to him on the ESMI System.  Id., Ex. 1 at 45-46.  Moreover, the plaintiff allegedly expressed to Saylor his belief that his non-selection was racially motivated, evidenced by the fact that all employees at the promotion level and at all other high-level positions at the BOP were held by "only . . . white staff . . . ."  Id. at 46; see also Compl. ¶ 38.  The plaintiff claims that Saylor informed him that he would talk to Gerald Gaes, Director of Research at the BOP, about the plaintiff's concerns.  Def.'s Mot., Ex. 1 at 46; id., Ex. 7 at 25.  Saylor contends that he told the plaintiff that there would be a second GS-13 position available soon, id., Ex. 5 at 29, and later that year the plaintiff was promoted to a GS-13 social science research analyst position, id., Ex. 2 at 1.  The plaintiff wrote a second journal article while in this new position, which was co-authored by his supervisor, Chris Innes.  Id., Ex. 2 at 7. This article was published in 2000 in the Journal of Offender Rehabilitation.  Id.  The plaintiff also notes that while in his various positions at the BOP, he received "outstanding" job performance ratings from his supervisors for his work in 1999, 2000, and 2001.[9]  Compl. ¶¶ 34, 35, 36, 37.

In March 2001, the plaintiff applied for another promotion to a grade level GS-14 social science research analyst position.  Def.'s Mot., Ex. 1 at 28.  He received a rating of 98 out of a possible 100 qualification points for the GS-14 position.  Id.  However, the plaintiff was not selected for the position, and he believes that the position was never filled.  Id. at 28-29.  Another

---

[9]  The plaintiff particularly references an appraisal on April 10, 2001, where William Saylor gave him an overall performance rating of  "outstanding" and noted that "his 'motivation, commitment and pursuit of excellence make him an outstanding member of the Office of Research and Evaluation.'"  Compl. ¶ 37.

vacancy for a GS-14 social science research analyst position was posted in August 2001.  Def.'s

Mot., Ex. 3 at 1.  The plaintiff claims that Saylor informed him that Ph.D. skills were necessary

to qualify for the position, and that Gaes told him "being enrolled in a Ph.D program should

increase one's promotion potential."  Compl. ¶¶ 19, 20.  So when the plaintiff applied for the

August 2001 vacancy, he was enrolled in a part-time criminology and criminal justice Ph.D.

program at the University of Maryland.  Id. ¶ 21.  However, he had not yet taken any courses.

Def.'s Mot., Ex. 1 at 44-45.  Batchelder, rather than the plaintiff, was also selected for this

position, and this non-selection of the plaintiff forms the basis for this action.[10]

### 2.   Jennifer Batchelder's Professional Background

Batchelder, a Caucasian female, Compl. ¶ 12, earned an undergraduate degree in

psychology from Gettysburg College in 1986 and a master's degree in public policy from George

Washington University in 1991.  Def.'s Reply, Ex. 15 at 5-6.  She has consistently received

outstanding job performance ratings as a BOP employee.  Id. at 1, 6.

Batchelder began her employment with the BOP as a social science research analyst

contractor in 1986.  Id. at 5.  In this position she primarily collected and entered data into

database forms for analysis.  Id.  She became a grade level GS-9 social science research analyst at

the BOP in 1989, and she was eventually promoted to the GS-12 grade level while in this

position.  Id. at 4.  During that time she began working on the Key Indicators and the ESMI

Systems and, although she primarily did computer programming, she also participated in a

---

[10]   The plaintiff states in his complaint that he is challenging "discrimination on the basis of [his] race regarding promotions."  Compl. ¶¶ 3, 42.  The plaintiff's deposition and pleadings, however, appear to indicate that he only challenges his failure to receive the August 2001 promotion and not the non-promotion in 1998 or March 2001.  See, e.g., Compl. ¶ 38; Def.'s Mot., Ex. 1 at 29.

number of projects and made a number of presentations.  Id. at 4-5.  Batchelder also was

involved in an analysis project during this period, which resulted in the writing of an unpublished

paper about the "perceptions of staff regarding their opportunity for advancement in the [BOP]"

that was presented at an Academy of Criminal Justice Sciences conference.[11]  Id. at 5.  As

previously stated, Batchelder was promoted to the GS-13 social science research analyst position

in 1998.  Id. at 3.  There, she worked as a project administrator for the Key Indicators System.

Id. at 3.  In this position, she was responsible for "coordinating monthly updates and

enhancements with approximately eight people, conducting data analyses and assisting staff in

the use of the system."  Id.  She was also the supervisor for three employees on the Key

Indicators System, and led training sessions for the BOP staff, which included "written

documentation and slide presentations."  Id. at 4.  When she applied for the August 2001 GS-14

social science research analyst position, Batchelder was working on a project that would lead to

the presentation of a research paper on sexual harassment issues.  Id. at 14.

### 3.     The Contested August 2001 GS-14 Promotion

In August 2001, the BOP announced the vacancy the for a social science research analyst,

GS-14 position.  Pl.'s Opp'n., Ex. 1.  The plaintiff, Jennifer Batchelder, and five other BOP

employees applied for the position.  Def.'s Mot., Ex. 10 at 2.  None of the applicants were

interviewed, Compl. ¶ 27; instead, the BOP "used a fairly generic set of knowledge, skills, and

abilities ('KSAs') for the purpose of evaluating applicant qualifications."  Pl.'s Opp'n at 5 (citing

Def.'s Mot., Ex. 4 at 90).  Six KSAs were used for evaluating the qualifications of the applicants

---

[11]   The plaintiff alleges that Batchelder had not produced any published works when she applied for the position that is the subject of this litigation.  Def.'s Mot., Ex. 1 at 40.  However, the plaintiff concedes that he was aware of two unpublished papers that she had completed.  Id. at 40-41.

for the GS-14 position.  Id.  These KSAs were listed on the vacancy announcement as the "(1) ability to manage resources, (2) ability to communicate orally, (3) ability to communicate in writing, (4) ability to apply social science research methods, (5) knowledge of statistical methods, and (6) ability to assign responsibility and delegate authority."  Id. (citing Def.'s Mot., Ex. 3 at 2).  The first step in the evaluation process of the applicants involved a review by the BOP Office of Human Resources to determine whether the applicants satisfied the basic KSA criteria.  Id. (citing Def.'s Mot., Ex. 4 at 90-91).  The second step was the referral of the qualified applicants to an evaluation board, which was comprised of Gaes and Saylor.[12]  Id. at 8.  The evaluation board scored the applicants based on their responses to the KSA factors and the board's own personal knowledge of the applicants.  Def.'s Mot., Ex. 4 at 120; id., Ex. 7 at 85. The evaluation board gave each of the applicants' KSAs a numerical score of either one, three, or five.  Pl.'s Opp'n, Ex. 4 at 1-2.  A score of one was considered "barely acceptable," three was "acceptable," and five was "highly acceptable."  Id.  Based on the scores the applicants received, the BOP's Human Resource Department determined the appropriate numerical cutoff point at which the best applicants[13] were placed on the "best qualified list."  Def.'s Mot., Ex. 9 at 29; id, Ex. 10 at 1-2.  Those who did not meet this minimum numerical requirement were not placed on the "best qualified list."  Id., Ex. 9 at 29.  In the final step, the applicants who made the "best qualified list" were referred to the selecting official for approval.  Def.'s Mot., Ex. 9 at 28-29.

_____

[12]  The complaint refers to the review conducted by Gaes and Saylor as the "selection board."  Compl. ¶ 26. However, because the other pleadings refer to this review as having been conducted by the "evaluation board," Def.'s Mot. at 8; Pl.'s Opp'n at 5-6, the Court will likewise refer to the review conducted by Gaes and Saylor as the "evaluation board."

[13]  "Best qualified applicants are those eligible candidates who rank at the top when compared with others eligible candidates for promotion."  Pl.'s Opp'n, Ex. 10 at 13.

The selecting official for the position at issue was Dr. Thomas Kane, Assistant Director for Information Policy and Public Affairs, who made the final hiring decision.  Id., Ex. 13 at 1-2.

Both the plaintiff and Batchelder satisfied the basic KSA factors and their applications were forwarded to the evaluation board for ratings.  See Def.'s Mem. at 8.  The evaluation board then awarded Batchelder more points than the plaintiff received.  Pl.'s Opp'n, Ex. 4 at 1-2.  Out of a possible thirty points, Saylor awarded the plaintiff ten points and Batchelder twenty-six points.  Id.  Gaes awarded the plaintiff twelve points and Batchelder twenty-six points.  Id. Notably, the plaintiff received only one point out of five on his "ability to communicate in writing" from each evaluator, while Batchelder received a score of five.  Id.  Both Saylor and Gaes expressed concern about the plaintiff's graduate degree thesis and technical writing abilities.  Def.'s Mem. at 9-11.  Batchelder, on the other hand, was given a score of five based on her technical and non-technical writing abilities, especially as they related to her duties in regards to the Key Indicators System.  Id. at 12-13.  The evaluation board articulated a variety of other reasons for the disparity in scoring, but the primary rationale was Batchelder's superior computer programming skills and knowledge of the Key Indicators System.[14]  Id. at 3; Def.'s Reply at 3. For example, Saylor noted that despite working for someone else after the administrator of the Key Indicators System departed, Batchelder offered her assistance and took on more responsibility in the management of the system.  Def.'s Mot., Ex. 4 at 78-79.

Because Batchelder received the highest cumulative numerical score from the evaluation board, she was the only applicant the evaluation board submitted to the deciding official on the

---

[14]  A complete description of Gaes's and Saylor's rationale for the scores awarded on each individual component is found in their depositions and need not be repeated here.  See Def.'s Mot., Ex. 4 at 123-140; Def.'s Mot., Ex. 7 at 85-126.

best qualified list.  Def.'s Mot., Ex. 10 at 1.  Therefore, Dr. Thomas Kane only received

Batchelder's name for his final approval as the deciding official for the GS-14 research analyst

position.  Id. at Ex. 13, at 2.  On October 12, 2001, Kane selected Batchelder for the position.

Def.'s Mot., Ex. 10 at 1.

## B.      The Parties' Arguments

The plaintiff believes that the evaluation of the candidates for the GS-14 Research

Analyst position was tainted by racial prejudice, and that he was intentionally denied a promotion

to the position at issue because of his race (African American) in violation of Title VII.  Compl.

¶¶ 39, 41-42.  The plaintiff asserts that evidence of this prejudice is apparent from the facts.

First, the plaintiff supposes that "Gaes and Saylor gave [the plaintiff] unjustifiably and

undeservedly low scores during the application rating process."  Id. ¶ 28.  Specifically, the

plaintiff believes that Gaes and Saylor improperly conferred with each other during the rating

process.  Id. ¶ 29.  As support for this belief, the plaintiff asserts that both Gaes and Saylor sat at

the same table and shared evaluation forms while rating the applicants.  Pl.'s Opp'n at 6-7.  In

addition, the plaintiff posits that the numeric scores he received from Saylor were inconsistent

with an evaluation seven months earlier, when Saylor had evaluated the plaintiff as "outstanding

in four different areas, including communications."  Id. at 8.    Moreover, although conceding

that he and Batchelder "were similarly situated in that they (a) held the same GS grade; (b)

worked in the same department; (c) had the same immediate supervisor; ([d]) had some similar

duties; and ([e]) had supervisory responsibilities," Compl. ¶ 14, the plaintiff maintains that he

was the superior candidate, id. ¶ 25.  In particular, the plaintiff posits that he had the skills

necessary for the GS-14 position, i.e., the ability to apply social science research methods and

knowledge of statistical methods, while Batchelder was primarily a computer programmer.  Id. ¶¶

15, 17.  The plaintiff also claims that he was more qualified because he was employed with the

federal government for a longer period of time, oversaw Batchelder's work on certain projects,

and published two articles in professional journals.  Id. ¶¶ 18, 23-25.  The plaintiff also believes

that he was better qualified because, although he had not yet received a Ph.D. degree, he was

enrolled in a Ph.D. program, while Batchelder neither had a Ph.D. nor was she enrolled in a

Ph.D. program.  Id. ¶¶ 21-22.  In addition, the plaintiff claims that his non-promotion was

retaliation for the "unofficial complaint" he made in 1998 about "racial imbalance" and "unfair

promotion selections" in the BOP's Office of Research and Evaluation.  Id. ¶¶ 38-39.

On the other hand, the defendant argues that there was no racial discrimination or

retaliation in the selection process.  Specifically, the defendant asserts that the evaluation board

had legitimate and nondiscriminatory concerns about the plaintiff's ability to perform the

responsibilities of the job as well as Batchelder.  Def.'s Mem. at 1.  While the defendant does not

dispute that Jackson was qualified for the position, id. at 8, the defendant claims that the

overriding factor that led to the decision to hire Batchelder instead of the plaintiff was

Batchelder's expertise with the Key Indicators System, id. at 17-18.  Moreover, although the

defendant does not deny that Saylor and Gaes were sitting at the same table when they conducted

their evaluations, see Def.'s Mot., Ex. 4 at 123, both evaluators dispute that they conferred in

scoring the applicants, id. at 122; id., Ex. 7, at 126.  The defendant posits, however, that even if

Saylor and Gaes had conferred, that would not have been a violation of BOP policy.  Def.'s

Reply Stmt. ¶11 (citing Def.'s Mot., Ex. 9 at 34).

## II.    Standard of Review

This Court will grant a motion for summary judgment under Rule 56(c) if "the pleadings,

depositions, answers to interrogatories and admissions on file, together with the affidavits, if any,

show that there is no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56(c).  When ruling on a summary judgment

motion, this Court must draw "all justifiable inferences" in the nonmoving party's favor and

accept the nonmoving party's evidence as true.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

255 (1986).  The Court "may not make credibility determinations or weigh the evidence."

Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).  However, the plaintiff

must establish more than "[t]he mere existence of a scintilla of evidence in support of the

plaintiff's position," Anderson, 477 U.S. at 252, and "some alleged factual dispute between the

parties will not defeat an otherwise properly supported motion for summary judgment; the

requirement is that there be no genuine issue of material fact."  Id. at 247-48 (emphasis in

original).  A "genuine" dispute exists "'if the evidence is such that a reasonable jury could return

a verdict for the nonmoving party.'"  Morgan v. Fed. Home Loan Mortg. Corp., 328 F.3d 647,

650 (D.C. Cir. 2003) (quoting Anderson, 477 U.S. at 248).  Therefore, the party opposing

summary judgment "'may not rest upon the mere allegations or denials of [the] pleadings, but . . .

must set forth specific facts showing that there is a genuine issue for trial.'"  Anderson, 477 U.S.

at 248 (quoting First Nat'l Bank of Ariz. v. Cities Service Co., 391 U.S. 253, 288 (1968)

(quoting Fed. R. Civ. P. 56(e)).  Under Rule 56(c), if "the nonmoving party has failed to make a

sufficient showing on an essential element of h[is] case with respect to which [he] has the burden

of proof," summary judgment is warranted.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

### III.  Title VII

**A.     Disparate Treatment Discrimination Claim**

The plaintiff alleges that he was the victim of racial discrimination in violation of Title

VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16, when Jennifer Batchelder was

selected over him for a promotion to a GS-14 level position as a social science research analyst.

Compl. ¶¶ 3, 25, 42.  Under Title VII, "[a]ll personnel actions affecting employees . . . shall be

made free from any discrimination based on race . . . ."  42 U.S.C. § 2000e-16(a).  In the absence

of direct evidence of discrimination that the BOP refused to promote him because of his race,

which is the case here, this Court must consider the plaintiff's claim under the burden-shifting

analysis established in McDonnell Douglas v. Green, 411 U.S. 792, 802-05 (1973).  Morgan, 328

F.3d at 650.

Under the McDonnell Douglas framework, to establish a claim under Title VII, the

plaintiff must first establish a prima facie case of discrimination.  McDonnell Douglas, 411 U.S.

at 802.  To establish a prima facie case of disparate treatment discrimination,

> [t]he plaintiff must prove by a preponderance of the evidence . . . "(i) that he
> belongs to a racial minority; (ii) that he applied and was qualified for a job for
> which the employer was seeking applicants; (iii) that, despite his qualifications, he
> was rejected; and (iv) that, after his rejection, the position remained open and the
> employer continued to seek applicants from persons of complainant's
> qualifications."

Tex. Dep't. of Community Affairs v. Burdine, 450 U.S. 248, 254 & n.6 (1981) (quoting

McDonnell Douglas, 411 U.S. at 802)).

If the plaintiff satisfies his prima facie case requirement, which is not an onerous task, the

burden shifts to the employer to "produc[e] evidence that the plaintiff was rejected, or someone

else was preferred, for a legitimate, nondiscriminatory reason." <u>Burdine,</u> 450 U.S. at 254.  The

employer's "burden is one of production, not persuasion." <u>Reeves,</u> 530 U.S. at 142.  Thus, the

employer "need not persuade the court that it was actually motivated by the proffered reasons . .

. . It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it

discriminated against the plaintiff." <u>Burdine</u>, 450 U.S. at 254 (citation omitted).  And once the

defendant presents a legitimate, non-discriminatory reason for the challenged employment

decision, "'the <u>McDonnell Douglas</u> framework— with its presumptions and burdens'—

disappear[s], and the sole remaining issue [is] discrimination <u>vel</u> <u>non</u>." <u>Reeves</u>, 530 U.S. at 142-

43 (internal citations omitted).  As to this question, the plaintiff must show that a reasonable jury

could conclude from all of the evidence that the adverse employment decision was made for a

discriminatory reason.  <u>See</u> <u>Aka v. Wash. Hosp. Ctr.</u>, 156 F.3d 1284, 1290 (D.C. Cir. 1998) (en

banc).  Specifically, this Court must consider "whether the jury could infer discrimination from .

. . (1) the plaintiff's <u>prima</u> <u>facie</u> case; (2) any evidence the plaintiff presents to attack the

employer's proffered explanation; and (3) any further evidence of discrimination that may be

available to the plaintiff . . . ." <u>Waterhouse v. District of Columbia</u>, 298 F.3d 989, 992-93 (D.C.

Cir. 2002) (quoting <u>Aka</u>, 156 F.3d at 1289).  Because the plaintiff continues to "bear[] the

'ultimate burden of persuasion,'" <u>Aka</u>, 156 F.3d at 1290 (quoting <u>St. Mary's Honor Center v.</u>

<u>Hicks</u>, 509 U.S. 502, 511 (1993)), the Court must assess the plaintiff's challenge to the

employer's explanation in light of the total circumstances of the case, and there are occasions

when "the fact that there are material questions as to whether the employer has given the real

explanation will not suffice to support an inference of discrimination," <u>id.</u> at 1291.

**B.    Retaliation Claim**

Title VII also protects an employee from retaliation for "oppos[ing] any practice made an unlawful employment practice by this subchapter" or for having "made a charge, testified, assisted, or participated in any manner in an investigation, preceding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  And, like other claims under Title VII, a claim of retaliation invokes application of the McDonnell Douglas burden-shifting framework in the absence of direct evidence of discrimination.  Davis v. Ashcroft, 355 F. Supp. 2d 330, 339 (D.D.C. 2005) (citing Lathram v. Snow, 336 F. 3d 1085, 1089 n.3 (D.C. Cir. 2003)).  A prima facie case of retaliation requires the plaintiff to establish "(1) that [he] engaged in statutorily protected activity, (2) that the employer took an adverse personnel action; and (3) that a causal connection existed between the two."  Mitchell v. Baldridge, 759 F.2d 80, 86 (D.C. Cir. 1985).  The plaintiff must also show that he was qualified for the position in question.  Id. at 86 n.5 (citations omitted).  To prove a causal connection, the plaintiff must establish that the "employer had knowledge of the employee's protected activity, and that the adverse personnel action took place shortly after that activity."  Id. at 86 & n. 6 (citations omitted).

### III.    Legal Analysis

**A.    The Plaintiff's Discrimination Claim**

The defendant does not allege that the plaintiff has failed to satisfy his burden of establishing a prima facie case of discrimination.  Def.'s Mem. at 17-18.  Moreover, the plaintiff does not argue that the defendant failed to state a legitimate non-discriminatory reason for the challenged employment decision.  Pl.'s Opp'n at 11-12.  Accordingly, the only question before the Court in this case is whether a reasonable jury could conclude from all the facts and evidence

that the plaintiff's non-selection for the position was for an improper discriminatory reason.

It is helpful to begin the Court's analysis by setting forth the defendant's asserted reason for not promoting the plaintiff.  Here, the defendant submits that the plaintiff was not promoted because the selecting officials decided that the "overriding objective for the Office of Research was to hire someone who could maintain the Office's essential and most important function — i.e., the Key Indicators Strategic System."  Def.'s Mem. at 18.  The plaintiff opines that pretext is shown because there were "inconsistencies and flaws" in the rating process, and that the plaintiff was in fact more qualified than Batchelder for the position based on the requirements set forth in the job announcement and position description.  Pl.'s Opp'n at 13-14 (alleging that "[t]he employer's prior high assessment of [the plaintiff in his previous evaluations] contradicts his lower rankings in the scoring for the promotion at issue").  After comparing the vacancy announcement, the position description and the applications of both Batchelder and the plaintiff, this Court finds that a reasonable jury could not conclude, based on the evidence, that the defendant's articulated reason for failing to promote the plaintiff was a pretext for discrimination. See, e.g., Buggs v. Powell, 293 F. Supp. 2d 135, 145-46 (D.D.C. 2003) (comparing the vacancy announcement for the position with the qualifications of the plaintiff and the successful applicant to determine whether "the employer could legitimately conclude that the plaintiff had more experience," and concluding that a reasonable juror could not infer discriminatory pretext because "the actual descriptions of [the plaintiff's] past work experience . . .  ha[d] been in areas other than [the desired] space planning [experience]" and the successful applicant had "substantial space planning experience.").

It is well-settled in this Circuit that "Title VII . . . does not authorize a federal court to

become 'a super-personnel department that reexamines an entity's business decisions.'" <u>Barbour</u>

<u>v. Browner</u>, 181 F.3d 1342, 1346 (D.C. Cir. 1999) (quoting <u>Dale v. Chicago Tribune Co.</u>, 797

F.2d 458, 464 (7th Cir.1986)).  In fact, the Circuit Court has instructed that

> [i]n cases involving a comparison of the plaintiff's qualifications and those of the successful candidate, we must assume that a reasonable juror who might disagree with the employer's decision, but would find the question close, would not usually infer discrimination on the basis of a comparison of qualifications alone.  In a close case, a reasonable juror would usually assume that the employer is more capable of assessing the significance of small differences in the qualifications of the candidates, or that the employer simply made a judgment call . . . . But this does not mean that a reasonable juror would in every case defer to the employer's assessment.  If that were so, no job discrimination case could ever go to trial.  If a factfinder can conclude that a reasonable employer would have found the plaintiff to be significantly better qualified for the job, but this employer did not, the factfinder can legitimately infer that the employer consciously selected a less-qualified candidate — something that employers do not usually do, unless some other strong consideration, such as discrimination, enters into the picture.

<u>Aka</u>, 156 F.3d at 1294 (internal citations omitted); <u>see</u> <u>also</u> <u>Vasilevsky v. Reno</u>, 31 F. Supp. 2d

143, 150 (D.D.C. 1998) (holding that "[e]ven if the plaintiff did prove that she were better

qualified that, without more, would indicate nothing more than the defendant made a faulty

hiring decision . . . [and] would not indicate . . . [discrimination] because of her age." ).

Moreover, the Fifth Circuit has noted that "unless disparities in [the qualifications of

applications] are so apparent virtually to jump off the page and slap us in the face, we judges

should be reluctant to substitute our views for those of the individuals charged with [making

employment related decisions] by virtue of their own years of experience and expertise in the

field in question." <u>Odom v. Frank</u>, 3 F.3d 839, 847 (5th Cir. 1993).  Thus, under the <u>McDonnell</u>

<u>Douglas</u> framework, the question "is not 'the correctness or desirability of [the] reasons

offered . . . [but] whether the employer honestly believes in the reasons it offers.'" <u>Fischbach v.</u>

D.C. Dep't of Corrections, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (quoting McCoy v. WGN Cont'l Broad. Co., 957 F.2d 368, 373 (7th Cir. 1992)).  Accordingly, absent a "demonstrably discriminatory motive," this Court must defer to the agency's decision of what non-discriminatory qualities it deemed necessary in filling the position.  Id. (quoting Milton v. Weinberger, 696 F.2d 94, 100 (D.C. Cir. 1982)).

The plaintiff asserts essentially two arguments in support of his position that the defendant's legitimate non-discriminatory reason for not selecting him is actually a pretext for discrimination.  First, the plaintiff claims that knowledge of the Key Indicators System was not part of the job description, which "overwhelmingly suggested a need for research skills and abilities."  See Pl.'s Opp'n at 13.  Second, the plaintiff contends that he is, based on the position description, more qualified for the job.  Id.  Neither position, however, is sufficient reason to reject the defendant's hiring decision, because to do so would require this Court to second-guess, without adequate basis, whether it was appropriate to promote Batchelder over the plaintiff.

First, assuming that knowledge of the Key Indicators System was not a necessary skill described in the job description to obtain the promotion, and that the defendant nevertheless primarily relied on this factor in promoting Batchelder over the plaintiff, these facts alone do not demonstrate pretext.  Earlier this year, in Davis v. Ashcroft, 355 F. Supp. 2d at 342-43, this Court made clear that an agency's reliance on a job skill possessed by one applicant, but not another, in making a hiring decision does not demonstrate pretext even if that job skill had not been listed as a qualification for the job.  Id.  In Davis, the plaintiff was an employee of the Federal Bureau of Investigation and sought a promotion to become a Section Chief for a division.  Id. at 333.  The plaintiff was not selected for the position, in part, because she did not have experience as an

Assistant Special Agent in Charge ("ASAC"), while the person selected for the position did. Id. at 340. This Court held that even though there was a factual dispute as to whether ASAC experience was a prerequisite for the position and ASAC experience was not part of any official written policy, a reasonable jury could not conclude that applying that requirement was a pretext for discrimination because the ASAC experience clearly related to the duties of a Section Chief. Id. at 341-43. This was because the "arguments made by the plaintiff [were] simply challeng[ing] the soundness of applying the ASAC requirement [and were not a] rebuttal of the agency's proffered explanation." Id. at 343 (citing Fischbach, 86 F.3d at 1183). "Accordingly, absent a 'demonstrably discriminatory motive,' th[e] Court [concluded that it had to] defer to the agency's decision of what non-discriminatory qualities it deemed necessary in filling the Section Chief position." Id. at 342 (citing Fischbach, 86 F.3d at 1183 (quoting Milton, 696 F.2d at 100)).

The case at hand is no different. Here, the plaintiff asks this Court to adopt the proposition that the evaluation board's reliance on knowledge of the Key Indicators System demonstrates pretext because it was not listed in the job description. Pl.'s Opp'n at 13. Clearly, as this Court indicated in Davis, this alone is insufficient to demonstrate pretext. Although the parties appear to dispute whether technical skill and experience with the Key Indicator System would be beneficial to the person assuming the GS-14 position, see id.; Def.'s Reply at 1-2, it is clear that Key Indicator System skills are a component of the overall skills necessary for the GS-14 position. As the job vacancy announcement states, "[t]he incumbent [will] examine[] trends and statistics about the bureau in order to describe the present condition and to predict future events." Pl.'s Opp'n, Ex. 1. Moreover, the job description requires the successful applicant to have "[i]n depth knowledge of correctional programs and BOP operations." Id., Ex. 2. Thus, it

is apparent that, although not specifically mentioned in the vacancy announcement or job description, the general terms used in these documents clearly indicate a desire on the part of the defendant to hire someone with skills acquired from working with the Key Indicator System. Accordingly, the plaintiff's first pretext argument must be rejected.

The plaintiff's second argument — that there were inconsistences and flaws in the rating process, and that he was more qualified — Pl.'s Opp'n at 13, is also without merit.  As the Circuit Court instructed, it is not the role of courts to "reexamine governmental promotion decisions where it appears the Government was faced with a difficult decision between two qualified candidates, particularly when there is no other evidence that race played a part in the decision."  Stewart, 352 F.3d at 430.  To prove pretext by comparing relative qualifications, there must be "evidence from which a reasonable jury could conclude that there was a wide and inexplicable gulf between the qualifications of [the applicants, and therefore a basis to] infer discrimination from the agency's choice."  Lathram v. Snow, 336 F. 3d 1085, 1091 (D.C. Cir. 2003) (citing Aka, 156 F.3d at 1294).[15]  Here, there is no "inexplicable gulf" between the plaintiff and Batchelder's qualifications which would indicate pretext, and it is therefore not proper to "second-guess [the] employer's personnel decision."  See Fishbach, 86 F.3d at 1183-84 (citation omitted) (holding that no evidence of racial discrimination was present when an employer decided to hire one candidate over another based solely on their answers provided during an interview).  Both the plaintiff and Batchelder had the same grade-level at the BOP

---

[15]  In Lathram, evidence showed that the plaintiff was "substantially more qualified" than the selected candidate who had "no experience in public affairs or public relations" compared to the plaintiff who had been specializing in the field for three years.  336 F.3d at 1092.  Similarly, in Aka, the plaintiff had a master's degree and nineteen years of experience in the employment field, while the person hired had not graduated from college and had only two-months part-time volunteer experience.  156 F.3d at 1296-97.

when the promotion decision was made, Pl.'s Opp'n, Ex. 8 at 2; <u>id.</u>, Ex. 5 at 1, they had similar

educational backgrounds at the time they applied, <u>id</u>, Ex. 8 at 9; <u>id.</u>, Ex. 5 at 3-4,[16] both had

completed written works and made oral presentations, <u>id.</u>, Ex. 8 at 7; <u>id.</u> Ex. 5 at 3, 5, and they

had similar duties, including supervisory responsibilities, <u>id.</u>, Ex. 8 at 2; <u>id.</u>, Ex. 5 at 16.  This

case is therefore virtually identical to <u>Vasilevsky</u>, 31 F. Supp. 2d at 143.  There, the plaintiff

attempted to support of her claim of age discrimination on her non-selection claim by showing

that her qualifications were superior to the individual selected for the position.  <u>Id.</u> at 149.  The

Court, after comparing the relevant qualification of the various applicants, concluded that the

> [p]laintiff's argument with respect to the comparison of her qualifications with those of the selected candidates truly misses the point.  It is the plaintiff's duty to put forth evidence of discrimination, not to quibble about the candidates' relative qualifications.  It is not within the court's province to second-guess an employer's choice of candidates. Even if the plaintiff did prove that she were better qualified that, without more, would indicate nothing more than the defendant made a faulty hiring decision.  Such evidence would not indicate that the plaintiff failed to obtain the position in question because of her age.  Unless the employer's choice of candidates can be shown to have been tainted by unlawful discrimination, it must be allowed to stand, no matter how unwise it may seem to the disappointed applicant.  Consequently, the plaintiff's opinion of the relative merits of her credentials as opposed to those of the selected individuals are irrelevant.

<u>Id.</u> at 150 (internal quotation marks and citations omitted).  The situation is no different here, and

the defendant is therefore entitled to judgment in his favor as to the plaintiff's second pretext

---

[16] The plaintiff had enrolled in a Ph.D. program at the time he applied for the position, Compl. ¶ 21, because Saylor informed him that the BOP intended to hire someone with Ph.D. level skills, <u>id.</u> ¶ 19.  The defendant disputes that this representation implied that enrollment in a Ph.D. program was required for the position.  Def.'s Reply at 3.  In fact, the vacancy announcement for the position does not list any particular education requirement. Pl.'s Opp'n, Ex. 1.  Nonetheless, as previously discussed with regard to the Key Indicators System skills, hiring someone who was not enrolled in a Ph.D. program does not establish that there was an "inexplicable gulf" between the qualifications of Batchelder and the plaintiff.  This is especially true because the plaintiff had not yet begun to actually take any Ph.D. classes.  Def.'s Mot., Ex. 1 at 44-45.

argument.[17]

For the foregoing reasons, the Court is compelled to conclude that the defendant is entitled to judgment in his favor on the plaintiff's discrimination claim.

**B.      The Plaintiff's Retaliation Claim**

The plaintiff also claims that his non-selection was the result of retaliation perpetrated because of an unofficial complaint that he made regarding what he believed was an earlier unfair promotion selection practice by the BOP.  Compl. ¶ 43.  As previously stated, to establish a prima facie case of retaliation, the plaintiff must prove "(1) that [he] engaged in statutorily protected activity, (2) that the employer took an adverse personnel action; and (3) that a causal connection existed between the two."  Mitchell, 759 F.2d at 86.  The defendant argues that the plaintiff's retaliation claim cannot survive because there was a "considerable time lapse" between his 1998 informal complaint and his 2001 non-selection, and thus, without more, there is insufficient evidence to demonstrate a causal connection between the two events.  Def.'s Mem. at 18-19.  For the following reasons, the Court agrees and concludes that the defendant is entitled to judgment in his favor on the plaintiff's retaliation claim.

_____

[17] To the extent that the plaintiff also alleges that there were inconsistencies or flaws in the rating process, these arguments are not borne out by the evidence submitted to the Court.  First, the plaintiff appears to claim that the rating process was flawed because the evaluators improperly conferred with each other.  See Pl.'s Opp'n at 7, 14.  The only evidence provided to the Court to support this proposition, however, is that the evaluators sat at the same table while completing their ratings.  Def.'s Mot., Ex. 4 at 123.  And it would clearly be unreasonable for the Court to assume that just because the evaluators sat at the same table, they must have conferred with one another.  Second, the plaintiff opines that his ratings for the promotion were contrary to his previous evaluations, which had rated him as outstanding.  Pl.'s Opp'n at 24.  Again, this argument is baseless, as the two evaluations are not comparable.  Clearly, an individual could receive outstanding ratings for his job performance in the position he currently holds, but fail to achieve the same ratings for a promotion to a new position that undoubtedly requires more expertise and different skills.  See, e.g., Forman v. Small, 271 F.3d 285, 291-93 (D.C. Cir. 2001) (noting that although there was no dispute that the employee was "highly praised" for his performance in his current position and "generally qualified for promotion," these factors were insufficient to establish discrimination in the absence of evidence showing that the employer's explanation for the employee's non-promotion was not a pretext).

First, the plaintiff has failed to even respond to the defendant's causal connection

argument in his opposition.  Accordingly, this Court will treat this argument as conceded and for

this reason alone the defendant is entitled to summary judgment in his favor.  See Local Rule

7.1(b); FDIC v. Bender, 127 F.3d 58, 67-68 (D.C. Cir. 1997); Buggs, 293 F. Supp. 2d at 141.

Moreover, even if the Court had to address the merits of the plaintiff's retaliation claim, which

the Court will do, it is clear that the defendant is entitled to summary judgment on the retaliation

claim.

The plaintiff's informal complaint was made in 1998 to his supervisor.  Compl. ¶ 38.

Assuming arguendo that the plaintiff engaged in protected activity by making the informal

complaint,[18] the plaintiff's retaliation claim must fail because the protected activity and the

adverse personnel action are not close enough together in time to establish the requisite causal

connection.  The temporal proximity between the statutorily protected activity and the adverse

action must be "very close" to establish a causal connection.  Hammond v. Chao, 383 F. Supp.

2d 47, 59 (D.D.C. 2005) (quoting Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273

(2001)).  For example, "courts generally have accepted [as a causally sufficient] time[,] periods

of a few days up to a few months and seldom have accepted time lapses outside of a year in

length."  Davis, 355 F. Supp. 2d at 352 (quoting Brodetski v. Duffey, 141 F. Supp. 2d 35, 43

(D.D.C. 2001)).  Here, the length of time between the informal complaint and the plaintiff's

failure to receive the challenged promotion was approximately four years.  This length of time is

far too great, without other evidence, to demonstrate a causal link.  See, e.g., Buggs, 293 F. Supp.

---

[18]  "[I]nformal complaints [can] constitute protected activity for purposes of alleging retaliation under Title
VII."  Villines v. United Broth. of Carpenters and Joiners of Am., AFL-CIO, 999 F. Supp. 97, 105 (D.D.C. 1998)
(citation omitted).

2d at 148-49 (citing numerous cases that support the conclusion that the time separation here

between a protected activity and a plaintiff's non-selection for a position is insufficient to support

a finding of a causal connection).  Accordingly, the plaintiff has failed to establish a <u>prima</u> <u>facie</u>

case of retaliation.

**IV.    Conclusion**

For the foregoing reasons, this Court grants the defendant's motion for summary

judgment.[19]

**SO ORDERED** on this 12th day of December, 2005.

REGGIE B. WALTON
United States District Court Judge

---

[19]  An order consistent with the Court's ruling accompanies this Memorandum Opinion.